UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Bruce Brown


        v.                            Civil No. 10-cv-257-SM


Dr. Celia Englander, et al.


O R D E R

    Bruce Brown brings this civil rights action pursuant to
42 U.S.C. § 1983, asserting that defendants have violated his
Eighth Amendment right to adequate medical care.  Brown also
asserts pendent state tort claims.  Because Brown is a prisoner,
the matter is before me for preliminary review to determine,
among other things, whether the complaint states any claim upon
which relief might be granted.  See 28 U.S.C. § 1915A.

Standard of Review

    In conducting the preliminary review of a prisoner case, as
required by 28 U.S.C. § 1915A, the Court construes all of the
factual assertions in the pro se pleadings liberally, however
inartfully pleaded.  See Erickson v. Pardus, 551 U.S. 89, 94
(2007) (per curiam) (following Estelle v. Gamble, 429 U.S. 97,
106 (1976), to construe pro se pleadings liberally in favor of
the pro se party).  "The policy behind affording pro se
plaintiffs liberal interpretation is that if they present
sufficient facts, the court may intuit the correct cause of

action, even if it was imperfectly pled." Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997); see also Castro v. United States, 540 U.S. 375, 381 (2003) (courts may construe pro se pleadings to avoid inappropriately stringent rules and unnecessary dismissals).  This review ensures that pro se pleadings are given fair and meaningful consideration.

To determine if a pro se complaint states any claim upon which relief could be granted, the Court must consider whether the complaint, construed liberally, Erickson, 551 U.S. at 94, "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009) (citation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  Inferences reasonably drawn from the plaintiff's factual allegations must be accepted as true, but the Court is not bound to credit legal conclusions, labels, or naked assertions, "devoid of 'further factual enhancement.'" Id. (citation omitted).  Determining if a complaint sufficiently states such a claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 1950 (citation omitted).

2

<u>Background</u>

Brown is a seventy-two year old inmate at the New Hampshire State Prison.  He is approximately fifteen years into a 20-40 year sentence for a 1995 sexual assault.

In late 2006 and early 2007, Brown began to experience intermittent lower back pain.  Brown reported his pain to the nursing staff at the New Hampshire State Prison's Health Services Center ("HSC").  The pain persisted, and on May 25, 2007, Brown was sent for an MRI at Catholic Medical Center in Manchester, New Hampshire.  The MRI showed a variety of lumbar abnormalities. The medical staff at the prison prescribed steroids and a muscle relaxant.

On May 28, 2007, Dr. Celia Englander, Medical Director for the New Hampshire Department of Corrections ("DOC"), told Brown that his MRI showed only mild disease, and referred him to physical therapy for evaluation.  On June 7, 2007, Brown received notification that he would receive pain management treatment for his back.  The following month, Brown was taken to the Elliot Hospital in Manchester, New Hampshire, to see Dr. Hyatt who gave him a cortisone shot in his spine.  Dr. Hyatt told Brown that an appointment for another shot should be scheduled after approximately three months.  Dr. Hyatt also told Brown that the shots were a temporary fix to relieve pain, but that he needed

back surgery to fuse his perforated discs (the medical condition causing his pain) to fix the underlying problem.

Brown states that the shot worked reasonably well in relieving his pain for about three months.  Brown was scheduled to return to see Dr. Hyatt for a second shot on November 5, 2007.  That appointment was cancelled by a corrections officer.  An appointment was rescheduled, but Brown did not receive a second shot for several months after the first shot stopped working.  Second and third cortisone shots effectively reduced Brown's pain for approximately three months each.  Brown has not received any further cortisone shots.

In early June 2008, Brown's pain became unbearable.  Brown submitted multiple request slips to prison medical staff pleading for treatment that would relieve his pain.  On June 12, 2008, Brown was told by a nurse that he was going to have another cortisone shot.  On June 17, 2008, DOC physician's assistant Gail Spelman told Brown she had put in for a transport for him to receive another shot.  She prescribed Indocin to assist in reducing inflammation and the resulting pain until his shot.  Brown was denied the Indocin, however, as a committee at the prison decided to temporarily discontinue distributing non-steroidal anti-inflammatory drugs ("NSAIDs") to inmates.

On June 19, 2008, Brown sent an Inmate Request Slip ("IRS") to Spelman about not having received the Indocin she prescribed.

4

The IRS was answered by a non-medical corrections officer stating that Spelman was no longer employed at the prison and that if he had medical issues he would need to go to sick call.

On July 1, 2008, Brown sent an IRS to Dr. Englander asking for help in relieving his pain, and advising her that Spelman had said she was setting up an appointment for a cortisone shot for Brown, and that she had prescribed Indocin for him that he had not received.  Another individual responded to Brown's request, stating that his consult was "in," that he would be notified when his appointment was set, and that there would be "no NSAIDS until after July 21, 2008."

On July 21, 2008, and August 14, 2008, Brown again sent inmate requests to Dr. Englander complaining that he was in terrible pain and requesting pain relief.  On August 14, 2008, Dr. Englander responded to Brown that a pain management consult had been ordered by Spelman and approved on August 4, 2008.

On August 22, 2008, Brown received an answer to his last IRS to Dr. Englander from another individual, advising him that a consult referral had been made to the pain management program at the Dartmouth Hitchcock Medical Center ("DHMC"), and that an appointment was going to be scheduled for him to have a consult there.  Dr. Englander then told Brown that, according to his original MRI report, and as Dr. Hyatt had stated to Brown in June 2007, his back pain was caused by perforated and damaged discs

5

that required surgical repair.  She promised Brown he would see a "specialist."

During August or September 2008, Brown was examined by Dr. Jenkins at Concord Hospital.  Dr. Jenkins stated that Brown was suffering from three damaged discs that required correction by surgery.

In December 2008, Brown was taken to the DHMC Pain Management Clinic for a consult with Dr. Beasley, a pain management specialist, for diagnostic testing.  At that time, Brown was taking medications provided to him by the prison medical staff.  Unbeknownst to Brown, DHMC had advised the prison that Brown's medications had to be discontinued prior to the consult.  Dr. Beasley refused to conduct the consultation because Brown was still on medications.

On December 16, 2008, Brown was taken back to Dr. Jenkins. Dr. Jenkins refused to see Brown because he had already seen and diagnosed him, and had nothing additional to offer.

On that date, Brown was called to the HSC by a woman named Cindy who identified herself as an intermediary who helps inmates get early medical release from prison.  Cindy told Brown that she was unable to assist him in obtaining an early release because of the nature of his offense.  Cindy said that Brown needed back surgery and surgery to correct an abdominal aortic aneurism that had been seen on his 2007 MRI.  Cindy told Brown that the back

surgery was very expensive and asked him if he had Medicare or
other outside financial resources, ostensibly to help pay for the
surgery.  Brown told Cindy he could not get Medicare while
incarcerated, and that he did not have money to pay for his own
surgery.

On December 22, 2008, Brown saw Campbell who told him that
she believed the only problem with his back was mild arthritis.
Brown believes that all orthopedic surgery conducted at the
prison requires her approval, and that she has thus far not given
her approval for his surgery.

On December 28, 2008, Brown sent an IRS to Dr. Englander
complaining about his excruciating pain and inquiring as to the
status of his surgery.  Dr. Englander responded that Dr. Jenkins
had not suggested surgery for his back, that Dr. Jenkins had
decided that Brown did not then need surgery, and that Dr.
Jenkins had instead suggested that Brown receive another
cortisone injection.  Brown had received no such injection.

Due to his ongoing debilitating pain, the DOC medical staff,
by early 2009, had treated Brown's symptoms with a myriad of pain
drugs, including Vicodin.  None worked very well, which Brown had
repeatedly told the medical staff.  Some of the drugs made Brown
nauseous or dizzy.  Brown later refused to take Vicodin because,
on one occasion, his Vicodin prescription, which had not expired,
was not refilled when he ran out, and he was forced to go through

7

a painful withdrawal in addition to his excruciating back pain.
After that, Brown refused to take narcotic medications for his
pain because he was concerned, based on the prison's track record
of not refilling his prescriptions in a timely manner, that he
would again be subjected to narcotic withdrawal.  Brown asserts
that narcotics were the only treatment he has refused, and he has
never refused treatment altogether.

On January 26, 2009, Dr. Englander told Brown he would be
sent to the Pain Management Clinic at DHMC for additional tests.
At around this time, Brown told Dr. Englander about a new
orthopedic and spine clinic that had opened in Bedford, New
Hampshire.  Dr. Englander said she would look into it.

On February 15, 2009, Brown sent an IRS to Dr. Englander
stating that he was still in tremendous pain and requesting
additional treatment and testing at DHMC.  Brown reiterated what
he had heard from Drs. Jenkins and Hyatt and asked for surgery,
not additional drugs, as he was worried about having the
medication suddenly withdrawn again by a failure to timely refill
his prescription.  Dr. Englander responded that Brown was
"seriously distorting the record" concerning his treatment and
about what Dr. Jenkins had said.

On March 16, 2009, Brown was taken to DHMC to see Dr.
Beasley.  Dr. Beasley inserted needles into his back which gave
him relief for approximately two hours, but worsened his pain

after that.  On April 5, 2009, Brown sent Dr. Englander an IRS telling her that the treatment he received at DHMC had made his pain worse.  Brown complained again that the "band aids" he had been receiving for his serious back problems in lieu of surgery were insufficient.  Donna Timulty responded to Brown that an appointment with Dr. Jenkins would be scheduled within the month.

On April 9, 2009, Brown filed a grievance with New Hampshire State Prison Warden Richard Gerry.  In his grievance, Brown complained that for more than two years he had suffered excruciating pain which had been, in the year prior to the filing of the grievance, untreated or treated ineffectively, as the pain relief measures were not particularly helpful, and the medical staff had refused to arrange for him to have surgery.  Brown told Gerry that he was having difficulty walking, sleeping, and eating due to the pain in his back which had also affected his legs and other parts of his body.  Gerry responded: "You have been informed that you are being scheduled for an appointment to an outside provider.  I have been informed that you refuse to take medication to manage the pain you are experiencing."  Gerry also told Brown to forward future grievances to Dr. McLeod, the Director of Medical and Forensic Services at the prison.

On April 26, 2009, Brown appealed the denial of his grievance to DOC Commissioner William Wrenn.  In that appeal he explained that he had taken narcotics with difficult side effects

9

and that his refusal to take morphine was based on a brutal withdrawal experience.  Dr. McLeod responded to Brown's grievance to Wrenn, stating that Dr. Jenkins would not see Brown until Dr. Beasley saw him at DHMC, and that an appointment would be scheduled at DHMC.  Dr. McLeod told Brown to go to sick call to address his pain issues.

Brown states that sick call exacerbates, rather than helps, his difficulties.  At sick call, he says, dozens of inmates cram into a waiting room with too few chairs.  Inmates at sick call wait, for up to several hours, to see a nurse who can do no more than provide a small amount of ibuprofen and schedule an appointment with a doctor for a week or more later.  Inmates, such as Brown, who can't move quickly are seen last as sick call operates on a "first come, first served" basis.

Between June 2009 and June 2010, Dr. Englander repeatedly promised Brown he would be going to DHMC for his spinal surgery. In September 2009, she told him he would be going "soon."  On October 27, 2009, Brown submitted an IRS to Dr. Englander to inquire about his appointment and to complain that the pain in his back and legs had spread to his groin.  Timulty responded and said that Brown had seen Dr. Mahn on October 19, 2009, although Brown does not recall this appointment occurring, and that he had prescribed Neurontin and Prednisone.  Brown states he got some temporary relief from those medications.

In December 2009, Dr. Englander told Brown he had been approved for back surgery at DHMC.  Although an appointment was scheduled for March 5, 2010, Brown was not given notice of that date in advance.  On the date of the appointment, Brown was at his work site and, due to a failure of the security staff to effectively communicate with one another, he was not returned to his unit to be transported to the appointment.  He was told later by the staff on his housing unit that he had missed the appointment.

When Brown requested an update on the status of his appointment from Dr. Englander, she told him that she was disappointed he "did not show up for the consult" when the doctor was expecting him.  Dr. Englander told Brown that the appointment would be rescheduled.  Later, Dr. Englander told Brown that his appointment had been with a "neurosurgeon" who was upset about the missed appointment because the surgery had already been scheduled.

On April 10, 2010, Brown went to sick call because his pain was so bad he couldn't sleep.  The nurse scheduled an appointment with a doctor a week later.  On April 20, 2010, Brown's pain was so bad he had to be brought to the HSC in a wheelchair.  Dr. Englander told Brown his surgery had been rescheduled.  Dr. Englander prescribed "knock out" medications so that Brown could

sleep.  The "knock out" medications were alternating Trazodone and Oxazepam.

On May 12, 2010, Brown was incapacitated with pain.  Another inmate told Dr. Englander that he was in too much pain to attend sick call, and asked for an appointment for Brown.  No appointment was made.

In early June 2010, Brown's "knock out" medications were removed from his housing unit medicine cabinet and not replaced with anything.  On June 14, 2010, Brown went to the HSC in a wheelchair.  The nursing staff arranged for him to receive Flexoril and Trazodone, but the combination didn't work as well as Trazodone and Oxazepam.  Since June 14, 2010, Brown states he has not been able to sleep more than an hour at a time due to pain.

On June 18, 2010, Brown was taken to DHMC for what he believed would be surgery.  When Brown arrived, Dr. Beasley explained that he had not been expecting him.  Further, Dr. Beasley told Brown that he is not a neurosurgeon, and was confused as to why the prison would think that Brown had been scheduled for surgery.  Dr. Beasley told Brown that he needed spinal surgery.  Dr. Beasley contacted the Surgery Department at DHMC, but they were unable to fit Brown into the schedule for that day.

Brown continues to suffer from extreme and persistent pain. He has experienced only incomplete and temporary pain relief from various treatments intended to treat pain.  Brown raises the following claims for relief[1]:

1.    The defendants have violated his Eighth Amendment right to adequate medical care by failing to consistently provide him with adequate pain medication and other pain treatment and allowing his prescriptions to lapse, causing him to experience serious withdrawal symptoms.

2.    The defendants have violated his Eighth Amendment right to adequate medical care for his damaged lumbar discs.

3.    The defendants have violated  Brown's state law rights under tort law by engaging in medical malpractice, negligence, and the intentional infliction of emotional distress.

<u>Discussion</u>

I.    <u>Section 1983</u>

Section 1983 creates a cause of action against those who, acting under color of state law, violate federal constitutional or statutory law.   <u>See</u> 42 U.S.C. § 1983[2]; <u>City of Okla. City v.</u>

---

[1]The claims, as identified herein, will be considered to be the claims raised by Brown in his complaint for all purposes.  If Brown disagrees with the claims, as identified, he must do so by properly objecting to this Report and Recommendation or properly moving to amend the complaint.

[2]42 U.S.C. § 1983 provides that:

Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

Tuttle, 471 U.S. 808, 829 (1985); Wilson v. Town of Mendon, 294
F.3d 1, 6 (1st Cir. 2002).  In order for a defendant to be held
liable under § 1983, his or her conduct must have caused the
alleged constitutional or statutory deprivation.  See Monell v.
Dep't of Soc. Servs., 436 U.S. 658, 692 (1978); Soto v. Flores,
103 F.3d 1056, 1061-62 (1st Cir.), cert. denied, 522 U.S. 819
(1997).  Here, Brown claims that the defendants, all state
actors, have violated his rights under the Eighth Amendment to
the United States Constitution.  As such, his claims arise under
§ 1983.

Inadequate Medical Care

     "[T]he treatment a prisoner receives in prison and the
conditions under which he is confined are subject to scrutiny
under the Eighth Amendment."  Helling v. McKinney, 509 U.S. 25,
31 (1993); Giroux v. Somerset County, 178 F.3d 28, 31 (1st Cir.
1999).  The pertinent Eighth Amendment prohibition on cruel and
unusual punishment applies to the States through the Due Process
Clause of the Fourteenth Amendment.  See Robinson v. California,
370 U.S. 660, 666-67 (1962).

     The Supreme Court has adopted a two-part test for reviewing
medical care claims under the Eighth Amendment.  See Farmer v.
Brennan, 511 U.S. 825, 834 (1994).  A court must first determine
if the prisoner has alleged facts sufficient to show that he or
she has not been provided with adequate care for a "serious

medical need." Second, the court must determine if the complaint contains sufficient allegations to show deliberate indifference. See id. at 834. Allegations that simply show "substandard care, malpractice, negligence, inadvertent failure to provide care, and disagreement as to the appropriate course of treatment are all insufficient to prove a constitutional violation." Ruiz-Rosa v. Rullan, 485 F.3d 150, 156 (1st Cir. 2007).

A serious medical need is one that involves a substantial risk of serious harm to the prisoner if it is not adequately treated. See Barrett v. Coplan, 292 F. Supp. 2d 281, 285 (D.N.H. 2003); see also Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990) (defining serious medical need as one "that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention"). To be found deliberately indifferent, a prison official subjectively must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must also draw the inference. See Farmer, 511 U.S. at 837. Deliberate indifference "may be shown by the denial of needed care as punishment and by decisions about medical care made recklessly with 'actual knowledge of impending harm, easily preventable.'" Ruiz-Rosa, 485 F.3d at 156 (citation omitted). "'In order to establish deliberate indifference, the complainant

must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain.'" <u>Braga v. Hodgson</u>, 605 F.3d 58, 61 (1st Cir. 2010) (citation omitted).  Deliberate indifference may be found "in 'wanton' decisions to deny or delay care, where the action is reckless, 'not in the tort law sense but in the appreciably stricter criminal-law sense, requiring actual knowledge of impending harm, easily preventable.'" <u>Watson v. Caton</u>, 984 F.2d 537, 540 (1st Cir. 1993) (citations omitted). Deliberate indifference is not demonstrated by an inmate's disagreement with his treatment, by an allegation that better treatment than what was provided is available, or by a difference of opinion among medical professionals regarding diagnosis and treatment.  <u>See Feeney v. Corr. Med. Servs.</u>, 464 F.3d 158, 162 (1st Cir. 2006) ("When a plaintiff's allegations simply reflect a disagreement on the appropriate course of treatment, such a dispute with an exercise of professional judgment may present a colorable claim of negligence, but it falls short of alleging a constitutional violation" (internal citations omitted)).

    A.   <u>Serious Medical Need: Perforated Discs</u>

Here, Brown has alleged facts showing that he suffers from perforated lumbar discs, diagnosed by physicians as requiring surgery, and causing him severe pain while uncorrected.  Brown has also alleged facts showing that his condition has worsened since 2007 -- that the pain is now excruciating and debilitating,

making it difficult at times for him to walk -- suggesting that the underlying condition may be degenerative in the absence of surgical repairs.  Liberally construing the facts alleged in the complaint, I find that Brown has stated sufficient facts to assert a claim that the worsening state of the perforated discs in his back constitutes a serious medical need, directly related to the severe and chronic back pain he alleges.

B.   <u>Deliberate Indifference</u>

The critical issue here is whether the prison's failure to ensure that Brown's condition was treated surgically, or that he continued to receive other effective modes of treatment, constitutes "deliberate indifference" to his serious medical need, and not "simply . . . a disagreement on the appropriate course of treatment." <u>Id.</u>  For the reasons that follow, I conclude that, liberally construing his complaint in his favor, and accepting all facts pled and all reasonable inferences arising as true, Brown has stated a viable claim that the defendants were deliberately indifferent to his serious medical needs.  I also find, however, that Brown cannot assert a claim for deliberate indifference to his pain based on difficulties with his medication.

1.  <u>Surgery</u>

Brown has alleged that every physician he has seen in an effort to treat or diagnose his back problems — four in all, including Dr. Hyatt, Dr. Jenkins, Dr. Englander, and Dr. Beasley — has told him that his perforated discs require surgery.  In July 2007, Dr. Hyatt told Brown that he needed surgery in order to repair his perforated discs.  In August or September 2008, Dr. Jenkins at Concord Hospital reported to both Brown and the prison medical staff that Brown needed surgery.  While Dr. Englander, in late December 2008, told Brown that Dr. Jenkins had recommended cortisone shots, not surgery (at that time) her understanding of Dr. Jenkins's opinion conflicted with her earlier interpretation of his findings, and the statements Jenkins made to Brown. Further, Dr. Englander told Brown he had been "approved" for back surgery at DHMC in December 2009, which, it can reasonably be inferred, suggested her agreement that Brown needed surgery.  As recently as April 2010, Dr. Englander told Brown that he would be scheduled for surgery "soon," and in June 2010, Dr. Beasley confirmed that Brown's back condition required surgical correction.

I find, for purposes of preliminary review, that Brown has stated sufficient facts to assert a plausible claim that he has a serious medical need that requires surgical correction, and that the prison defendants have refused to provide, or delayed in

providing, necessary treatment, being fully aware that failure to do so would result in Brown's continuing to suffer serious, but avoidable, pain.  Service of this claim shall be made on defendants Englander, McLeod, Gerry, and Wrenn.[3]

> 2.   <u>Medication Difficulties</u>

Brown alleges that the provision of medication constituted deliberate indifference in that prescriptions were routinely allowed to lapse between refills, even for medications that should not be abruptly withdrawn.  Further, Brown takes issue with some of the medication choices offered to him.

There is no indication in Brown's complaint that, if true, the failure to consistently maintain prescriptions was intentional or designed to cause pain or distress to Brown.  At best, Brown has made out a case for negligence with respect to the failure of prison staff to refill prescriptions on time.  No claim arises under § 1983 for an act of negligence, however, and I find that the facts asserted here are insufficient to describe a violation of Brown's federal constitutional rights related to the provision of medication.  Brown's other medication complaints amount to mere disagreements with medical staff about which medications should be administered or prescribed.  No constitutional claim arises out of such disagreements absent a

---

[3]As explained below, I find that Brown has failed to state any cognizable claim against defendant Bernice Campbell; the complaint is dismissed with respect to Bernice Campbell.

showing that the prescribing doctor was deliberately indifferent to Brown's serious medication needs. The claims asserting deliberate indifference with regard to administering medications to plaintiff are dismissed.

## II. State Law Claims

Where, as here, there is no diversity of citizenship, jurisdiction over plaintiffs' state law claims is supplemental or pendant. See 28 U.S.C. § 1367(a) (allowing court to exercise supplemental jurisdiction over state law claims that are "so related to the claims in the action within the original jurisdiction that they form part of the same case or controversy"); see also United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966). Plaintiff's state law negligence, medical malpractice, and intentional infliction of emotional distress claims arise out of the same facts and circumstances asserted in his federal claims. Accordingly, at this juncture, there is no good reason not to exercise this Court's supplemental jurisdiction, see 28 U.S.C. § 1367(a). Brown's state claims may proceed against defendants Englander, McLeod, Gerry, and Wrenn.

## III. Supervisory Liability

Brown has alleged that defendants McLeod, Gerry, and Wrenn are responsible for developing and applying policies or practices that violate Brown's constitutional rights, and for failing to adequately respond to Brown's grievances about his surgery and

medical care needs.  In their capacities as supervisors,

defendants are responsible for responding to inmate requests,

administering grievance procedures, developing prison policies as

they relate to the provision of and payment for medical care,

including care that must be received from outside medical

providers, and supervising prison staff.

There is no supervisory liability in § 1983 actions based on

a respondeat superior theory of liability.  <u>See</u> <u>Ashcroft</u>, ___

U.S. at ___, 129 S. Ct. at 1949.  "Supervisory liability under

§ 1983 cannot be 'predicated on a respondeat theory, but only on

the basis of the supervisor's own acts or omissions.'"  <u>Aponte</u>

<u>Matos v. Toledo Davila</u>, 135 F.3d 182, 192 (1st Cir. 1998)

(citation omitted).  A supervisor must be either "a primary actor

involved in, or a prime mover behind, the underlying violation."

<u>Camilo-Robles v. Zapata</u>, 175 F.3d 41, 43-44 (1st Cir. 1999).  In

other words, "supervisory liability lies only where an

affirmative link between the behavior of a subordinate and the

action or inaction of his supervisor exists such that the

supervisor's conduct led inexorably to the constitutional

violation."  <u>Maldonado v. Fontanes</u>, 568 F.3d 263, 275 (1st Cir.

2009).

"[S]upervisory liability under a theory of deliberate

indifference will be found only if it would be manifest to any

reasonable official that his conduct was very likely to violate

an individual's constitutional rights." <u>Id.</u>  A supervisor is not deliberately indifferent, for purposes of § 1983 liability, if he or she is alleged merely to have been present for, or otherwise obtains knowledge of, the wrongdoing of a subordinate, or if the supervisor promulgated a policy that does not, on its face, direct or condone the wrongful conduct of subordinates.  <u>Id.</u>

Here, plaintiff alleges that each named defendant participated in the unconstitutional deprivations alleged, by condoning their subordinates' failure to insure that Brown received the surgery he needed and attempting to lessen his pain while denying or delaying the treatment of his physical back problems.  Defendants refused to remedy, and to have continued to support, the practices brought to their attention through the inmate request and grievance processes.  Accordingly, these defendants can be sued in their supervisory capacities under section 1983.

IV.  <u>Defendant Bernice Campbell</u>

Brown asserts that Bernice Campbell improperly interpreted certain medical information that had been provided her, concluding that he was suffering only from mild arthritis.  There are no facts pled, however, that would support the contention that Campbell's statement was anything more than a mistaken medical assessment or an inadvertent error.  Nothing in Brown's complaint suggests that Campbell was "deliberately indifferent"

22

to his medical needs or even that she acted negligently.
Further, to the extent Brown claims that Campbell's signature is
necessary for him to obtain orthopedic surgery, and she failed to
provide such a signature, it appears that Brown is asserting only
an unsupported belief.  Neither the notion that a doctor at the
prison could not order surgery without the signature of a
physical therapist, nor that a physical therapist could arrange
for surgery without a doctor's order, are plausible.  Brown has
not otherwise asserted that Campbell provided any substandard,
negligent, or improper care to him, or injured or damaged him in
any way.  Because Brown has failed to state any claim against
Campbell upon which relief might be granted, I dismiss the
complaint as it pertains to her.

Request for Preliminary Injunctive Relief

Brown's complaint includes a request for preliminary
injunctive relief.  Because that request was filed several months
ago, and the Court has received no separate motion or request for
injunctive relief from plaintiff, the request is denied without
prejudice to refiling as a Motion for Preliminary Injunction if
circumstances warrant.

Conclusion

For the foregoing reasons, I find that Brown's complaint
adequately asserts an Eighth Amendment claim relating to the
denial of surgery, and state law claims against defendants

23

Englander, McLeod, Gerry, and Wrenn, including supervisory capacity claims against McLeod, Gerry, and Wrenn.  The claims alleging improper medical care for medication difficulties, and the claims against defendant Campbell are dismissed.

Plaintiff has submitted summons forms for Wrenn, McLeod, Gerry, and Englander, all listing a New Hampshire State Prison address.  The Clerk's Office is directed to issue the summonses for Wrenn, McLeod, and Gerry to plaintiff's counsel, who must effect service according to Fed. R. Civ. P. 4.  Defendant Englander is not a state employee, but an employee of MHM Services, Inc., and therefore Dr. Englander must be served as would any non-prison-employee.  Plaintiff's counsel is directed to provide a summons with a correct address for defendant Englander to the court for issuance within fourteen (14) days of the date of this Order.  Counsel must then effect service on defendant Englander in compliance with Fed. R. Civ. P. 4.

Brown is instructed that all future pleadings, written motions, notices, or similar papers shall be served directly on the defendants by delivering or mailing the materials to them or their attorney(s), pursuant to Fed. R. Civ. P. 5(b).

**SO ORDERED.**

Steven J. McAuliffe
Chief Judge

November 24, 2010

cc:  Nancy Sue Tierney, Esq.

24